# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

JASON HEAD,                   }
}
      **Plaintiff**          }
}
**v.**                       }
}    **Case No.: 2:15-cv-02118-RDP**
**NORFOLK SOUTHERN RY. CO.,**    }
}
      **Defendant**       }
}

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendant's Motion for Summary Judgment (Doc. # 26), filed on February 10, 2017, and Defendant's Motion to Strike Certain Evidence (Doc. # 34), filed on March 31, 2017. The parties have fully briefed the motions, which are now under submission. (Docs. # 27, 28, 29, 32, 36). For the reasons explained below, Defendant's Motion to Strike is due to be denied. And, Defendant's Motion for Summary Judgment is due to be granted in part and denied in part.

Defendant is a railroad carrier under 49 U.S.C. § 20102 and 49 U.S.C. § 20109 and Plaintiff Jason C. Head ("Plaintiff") was an employee within the meaning of § 20109. (Doc. # 28-20 at 1). Plaintiff claims that Defendant violated § 20109, also known as the Federal Railroad Safety Act ("FRSA"), by (1) removing him from service on September 20, 2013, (2) charging him with a rule violation and subjecting him to a disciplinary investigation, and (3) dismissing him on February 14, 2014. (Doc. # 28 at 22). After careful review, the court finds there are material issues of fact about whether Plaintiff's safety complaints were protected activities that contributed to Defendant's decision to terminate Plaintiff's employment.

## I.    Statement of Facts

The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

### A.    Plaintiff's Employment History

Plaintiff was employed by Defendant as a carman from 1998 until February 14, 2014. (Doc. # 32-2 at 1). At the times relevant to this case, Plaintiff worked as a gang leader on the third shift at Norris Yard near Birmingham, Alabama. (Doc. # 28-1 at 102-03, 161-62, 227-28). The gang leader is part of a crew of carmen, but is paid extra to arrive early and stay late during shifts in order to complete daily train yard reports of the crew's car inspections. (Docs. # 28-21 at 24; 28-26 at 4). As members of Defendant's Mechanical Department, carmen regularly inspect railcars on outgoing trains, perform light repairs on cars, and test the air brakes on the trains. (Docs. # 28-1 at 137-38; 28-14 at 1; 28-26 at 2-3). If, during the course of the inspection, a carman deems a railcar to be unsafe, the car receives a "bad-order tag" and is sent to the repair shop. (Doc. # 28-1 at 12).

Norris Yard has two main yards, the East Yard and the West Yard. (Doc. # 28-26 at 3). More trains depart from the West Yard, and it is longer than the East Yard. (Docs. # 28-26 at 3; 28-28 at 12-13). In September 2013, the Mechanical Department at Norris Yard had six Kubota

ATVs[1] and Chevrolet trucks at its disposal for travelling between the diesel shop, car shop, and inspection yards. (Doc. # 28-26 at 2). Typically, at that time, the West Yard crew used two Chevrolet trucks, while the East Yard crew used two Kubotas. (Doc. # 28-1 at 99). Carmen who worked in the West Yard traveled along "the main thoroughfare" with 18-wheelers and dump trucks. (*Id.* at 82-83).

During Plaintiff's tenure at Norfolk Southern, but at least several years[2] before a September 2013 disciplinary action that is at issue in this case (and discussed in detail below), Plaintiff came to believe that Norfolk Southern's management was responding to an increase in Federal Railway Administration ("FRA") inspections at the Norris Yard by discouraging carmen from taking mechanically defective cars out of service. (*Id.* at 46-47). Plaintiff has testified that several managers at the Norris Yard, including (1) Steve Collier, a general foreman, (2) Tom Bartley, a former superintendent at Norris Yard, (3) Tim Spence, Bill Swanson, and G.G. Jones, mechanical supervisors, (4) David Walker, a senior general foreman, and (5) Ed Mickens, a division manager, discouraged employees from bad-ordering cars.[3] (*Id.* at 29-56). Plaintiff recalled that Swanson "made it appear[ ] that [he] had fraudulently bad[-]ordered a car" because Collier and Swanson made him explain why he reported a car for droplets of hydraulic fluid that were present at the time of Plaintiff's inspection. (*Id.* at 37-41). Although the hydraulic fluid had

---

[1] An all-terrain vehicle, or "ATV," is "any motorized, off-highway vehicle designed to travel on 3 or 4 wheels, having a seat designed to be straddled by the operator and handlebars for steering control." 15 U.S.C. § 2089(e)(1)(A).

[2] During his deposition, Plaintiff could not recall when the supervisors discouraged him from bad-ordering rail cars. (*See* Doc. # 28-1 at 30-31, 42, 44, 49, 52). Plaintiff testified, though, that an incident with Bill Swanson occurred well before Plaintiff's leave of absence from Norfolk Southern in 2011. (*Id.* at 42). And, he asserted that David Walker discouraged him from bad-ordering cars "well before" his leave of absence. (*Id.* at 45). Finally, Plaintiff recalled that G.G. Jones questioned some of his bad-order tags years before his leave of absence. (*Id.* at 52-53).

[3] Another unnamed supervisor told the carmen "to keep the bad orders low." (*Id.* at 60-61).

been "wiped away from the truck side frame," Plaintiff found more hydraulic fluid underneath the frame. (*Id.* at 38). Moreover, Collier threatened to "abolish [Plaintiff's] job" by changing his schedule so that he could not work as a carman and attend school. (*Id.* at 63-64).

In 2004, Plaintiff filed a complaint with the FRA. (*Id.* at 11, 13). In the FRA complaint, Plaintiff alleged that Collier had illegally removed the bad-order tags for four railroad cars and had sent them on to further destinations without performing necessary repairs.[4] (*Id.* at 12-16). According to Plaintiff, Ferrell Arms, a FRA agent, told him that the cars were in fact defective and should have been bad-ordered.[5] (*Id.* at 14). Collier was not interviewed by the FRA or disciplined for an FRA violation after the cars were sent on without repair. (Doc. # 28-14 at 2; *see also* Doc. # 28-1 at 16-17 (Plaintiff testifying that he did not know whether Collier was disciplined for the incident)). Following his FRA complaint, John Manning, another carman, told Plaintiff that he heard management state that they were "out to get" him. (Doc. # 28-1 at 254-55). Manning informed Plaintiff that he had been questioned about the bad-ordered railcar with leaking hydraulic fluid because of management's feelings towards him. (*Id.*). Eric Churilla, a supervisor, told Plaintiff not to bad-order any more cars because they were "looking for" him.[6] (Doc. # 28-1 at 255).

In 2004, Norfolk Southern disciplined Plaintiff for sleeping in a company vehicle while on duty. (Doc. # 28-11 at 2). He received a deferred 15-day suspension for the offense. (*Id.*). In

---

[4] Running bad-ordered cars is an FRA violation, unless the cars are being moved for repair purposes. *See generally* 49 C.F.R. § 215.9.

[5] In contrast, Collier has recounted that another carman and he appropriately removed the bad-order tags because the air brakes on the railcars were in good working order. (Doc. # 28-14 at 2). Given that this case is at the Rule 56 stage, the court accepts Plaintiff's averment that Arms informed him of an FRA violation concerning the railcars.

[6] Defendant did not raise any hearsay objection to this statement in its Motion to Strike. (*See generally* Doc. # 34).

November 2010, Norfolk Southern disciplined Plaintiff for excessive speeding and careless driving. (*Id.*). Plaintiff received a five-day deferred suspension for that offense. (*Id.*). In August 2011, Norfolk Southern disciplined Plaintiff for hanging an end-of-train device on a train "without blue flag protection."[7] (*Id.*). Plaintiff received a deferred 30-day suspension for that violation. (*Id.*). Then, in November 2011, Plaintiff disciplined Plaintiff again for failing to display a blue flag. (*Id.*). Plaintiff received a five-day suspension for that offense, and Norfolk Southern also activated the previously deferred 30-day suspension. (*Id.*). In December 2011, Plaintiff left his position under a leave of absence after breaking the scaphold bone in his left hand. (*Id.* at 1; Doc. # 28-1 at 77). He returned to work in June 2013. (Doc. # 28-11 at 1).

### B.  Plaintiff's Use of the "Unsafe" Kubota ATV

In September 2013, one of the trucks in the West Yard was taken out of service due to front axle damage. (Doc. # 28-1 at 277). From September 12, 2013 until September 18, 2013, the West Yard crew used a Kubota ATV while their truck was in the repair shop. (*Id.* at 95-96, 103). Plaintiff drove the ATV assigned to the West Yard crew during that week. (*Id.* at 95). Although Plaintiff "complained about the Kubota from the beginning," his complaints were not always related to the vehicle's safety. (*Id.* at 96-97). Plaintiff's first grievance to Mike Weaver, a supervisor, concerned only the fact that that he had to drive the Kubota. (*Id.*). Plaintiff has testified that he did not complain about the Kubota's safety during his initial complaints to Weaver because he "was just gaining experience with the Kubota at that point." (*Id.* at 96). Weaver allowed the West Yard crew to use his supervisor's truck until the other truck was repaired, but Plaintiff continued to use the ATV, while other members of the West Yard team used Weaver's truck. (*Id.* at 186-187). Plaintiff did not complain about the assignment of the

---

[7] Carmen use a blue flag or blue light while inspecting trains to warn others that the track is blocked. (*See* Doc. # 28-1 at 145).

ATV on the daily reports he submitted for September 12, September 15, September 16, or September 17. (*See* Doc. # 28-27 at 1, 4-6).

On September 18, 2013, Plaintiff worked as the gang leader of the five-person third shift crew in the West Yard. (Doc. # 28-1 at 103). The Third Shift started working at 11 p.m. the night of the 18th and ended work at 7 a.m. the morning of September 19th. (*Id.* at 103, 105; Doc. # 28-21 at 19). Around that time, the West Yard's truck was returned from the repair shop. (Doc. # 28-1 at 96). Upon the vehicle's return, Collier and Jeff Freeman, a mechanical supervisor, decided to assign the repaired truck to the East Yard crew instead of the West Yard crew. (Docs. # 28-21 at 13-14; 28-26 at 4; 28-28 at 22-23). Freeland has explained that they reassigned the truck "to protect [their] operation" because West Yard crews -- on all three shifts -- had damaged several vehicles.[8] (Doc. # 28-21 at 14). However, Plaintiff has testified that the East Yard crew did not use the truck at all because one of the bridges in the East Yard was too narrow for a truck. (Doc. # 28-1 at 271-74). Although Norfolk Southern's paperwork stated that the truck was assigned to the West Yard, it remained parked in the East Yard. (*Id.* at 273-74).

Plaintiff has recounted that the Kubota ATV presented several safety issues. First, he observed that the Kubota used by the West Yard crew had an inadequate windshield and the driver could not see through it. (*Id.* at 81). Second, he believed that the ATV was unsafe because workers had to drive it on the same road with 18-wheelers and dump trucks. (*Id.* at 82-84). Plaintiff complained about this issue at some point before September 18, 2013. (*Id.* at 84). Third, he also complained that the ATV had a governor on its engine. (*Id.* at 85). Plaintiff explained that the governor created problems because the ATV backed up traffic on the road in the West Yard. (*Id.* at 85-86). Finally, Plaintiff asserted that the ATV could not handle the rough roads in the

---

[8] In contrast, Ryan McLain has averred that Freeman and Collier reassigned the truck so that each yard crew would have a truck and an ATV to use. (Doc. # 28-26 at 4-5).

West Yard. (*Id.* at 88-89). He contends that a driver could not reduce the effect of the rough roads through throttle control because the power would suddenly increase as the driver applied more throttle. (*Id.* at 89-91).

### C.     Plaintiff's Complaints About the Kubota ATV

At 6:44 a.m. on September 19, 2013, Plaintiff contacted Freeman and asked him when the truck would be returned to the West Yard. (Doc. # 28-21 at 24-26). Freeman told him "the truck wasn't coming back out there" and refused to discuss the issue further because a train had derailed in Norris Yard. (Docs. # 28-1 at 208-10; 28-21 at 24-26). Plaintiff told Freeman that he "wanted to come and see him" because Plaintiff was "soaked" after driving the ATV for the shift. (Doc. # 28-21 at 26).

At 7:10 a.m., Plaintiff complained to Mariola Green, a clerk who worked in Norris Yard's locomotive shop, that Freeman was an "asshole" and a "motherfucker" for assigning the ATV to the West Yard because "riding in the [open-air] Kubota wasn't good" for his health. (Docs. # 28-5 at 22-23; 28-22 at 6, 9-10). Plaintiff attempted to call Freeman again to arrange a meeting but did not reach him. (Doc. # 28-23). Green testified that Plaintiff appeared upset, but she did not believe Plaintiff was dangerous. (Docs. # 28-5 at 23; 28-22 at 11). Green did not report Plaintiff's outburst as a threat, despite the fact that Norfolk Southern employees who perceive serious threats are expected to report them immediately. (Docs. # 28-22 at 34; 28-25 at 77). Indeed, Green conversed with Plaintiff about their daughters after the outburst. (Doc. # 28-23). Green stated during her deposition that she was "used" to that type of language. (Doc. # 28-22 at 10). And, Freeland admitted to using the word "motherfucker" and other curse words while working. (Doc. # 28-21 at 62-63).

Following his conversation with Green,[9] Plaintiff stated to Chris Dodson, another carman, that Freeman had "an ass whipping coming." (Docs. # 28-6 at [158]; 28-9). Dodson went to work with Freeman on the train derailment, but did not mention Plaintiff's comment to Freeman while at the derailment site. (Doc. # 28-21 at 30). After the two men returned to the office, Dodson relayed Plaintiff's comment to Freeland, who asked Dodson whether he was serious. (*Id.* at 30-31). Although Dodson replied to the question by saying "that's what he said," he did not affirmatively answer whether or not he perceived the threat to be a serious one. (*Id.* at 31-32). Freeman reported Plaintiff's statement to Collier at approximately 1:00 p.m., after Collier had arrived at Norris Yard. (*Id.* at 33-34).

After his conversation with Dodson, Plaintiff prepared the daily safety and maintenance checklist for his shift. (*See* Doc. # 28-1 at 176, 178). In the report, Plaintiff explained that the third shift had to work on a train transferred to them by the second shift. (Doc. # 28-3). Plaintiff also explained other delays that the third shift encountered on its assigned trains. (*See id.*). Then, he discussed the assignment of the ATV to the West Yard crew:

> Much time was lost [ ] due to Mech. Super. Jeff Freeland giving our yard truck to the East Yard who doesn't need it & historically hasn't used it, & giving us a Kubota to traverse the expansive perimeter of the West Yard @ a snail's pace. Mech. Super. Freeland denies a policy of blanket punishment but the facts speak clearly. The Kubota is inappropriate for West Yard use. It exposes us to hazards & dangers not encountered in a yard truck given the extreme distances we are required to traverse in performance of our duties. Freeland took our truck & assigned us a Kubota due to truck damage done by a few.

(*Id.*).[10] Plaintiff delivered copies of the daily report to Ryan McLain, a division manager, and Greg Swany, a mechanical superintendent, at approximately 11:00 a.m. on September 19. (Doc.

---

[9] Plaintiff has agreed with Dodson's averment that their conversation occurred between 7:15 and 7:45 a.m. on September 19. (Docs. # 28-1 at 182; 28-9).

[10] Kenneth Cooper, a local union chairman, has indicated that a consulting firm investigated management's use of "collective punishment" and that he participated in the process. (Doc. # 32-3 at 3). According to Cooper, the

# 28-1 at 179-80). Plaintiff also sent copies of the daily report to a distribution list for the mechanical department. (*Id.* at 189-90). McLain and Swany were not in their offices when Plaintiff submitted the report to them. (*Id.* at 187-88).

Plaintiff worked on the third shift at the West Yard during September 19 and 20, 2013. (Doc. # 32-2 at 3). At the beginning of his September 19 shift, Plaintiff contacted Ladel Miles, a supervisor, to again voice his concerns about the safety of the Kubota. (Doc. # 28-28 at 24-25). Specifically, Plaintiff complained about his ability to see through the ATV's windshield. (Doc. # 28-1 at 166). Miles met Plaintiff in the West Yard office and inspected the Kubota. (Docs. # 28-1 at 166-67; 28-28 at 25). Miles also rode with Plaintiff in the ATV for a distance. (Doc. # 28-1 at 168-70). Miles did not find that the Kubota was unsafe, but he nevertheless attempted to resolve Plaintiff's complaints by cleaning the windshield. (*See* Doc. # 28-28 at 30-31). Plaintiff asked Miles whether the truck would be returned, but Miles replied that the allocation of vehicles "had already been made by [his] supervisors." (*Id.* at 31).

Plaintiff was not formally disciplined for his comments in the September 18 train report. But, on September 20, Plaintiff was counseled against using the daily report to raise complaints because the report was "a record widely circulated within [Norfolk Southern]." (Doc. # 28-26 at 8). Collier, Freeman, and Miles attended the counseling meeting. (Doc. # 28-1 at 118). The managers told Plaintiff that the daily report "was not a proper place to report safety violations." (*Id.*). The managers also complained about Plaintiff's management of the third shift and accused them of "goofing off."[11] (*Id.* at 152-53). Plaintiff was unfamiliar with any written grievance

---

consulting firm "found that the Mechanical Department work environment in Birmingham was intimidating to employees and that there were bad misuses of the discipline process by [Norfolk Southern] management." (*Id.*). Cooper has stated that the use of collective punishment harmed employees' morale and created "a less safe work environment" at Norris Yard. (*Id.*).

[11] Plaintiff suggested during the deposition that the management complaints occurred while they were discussing the bad-order tags placed on two railcars. (Doc. # 28-1 at 152). But, the record is unclear as to whether

procedure for safety issues. (*Id.* at 120-21). Plaintiff asked Collier, Freeman, and Miles why the truck had been reassigned to the East Yard. (*Id.* at 127). When Miles summoned Plaintiff to the meeting, he told Plaintiff -- in response to a question -- that he did not need to bring a union representative. (*Id.* at 128). Nevertheless, Plaintiff brought a union representative, Kenneth Cooper, to the meeting. (*Id.* at 128-29).

### D. The Norfolk Southern Disciplinary Process

Under the employee conduct rules in the Norfolk Southern Corporation Book of Safety and General Conduct, "[e]mployees are to conduct themselves in a professional manner and not engage in behavior or display material that would be considered offensive or inappropriate." (Doc. # 28-5 at 21). This includes the making of disparaging remarks. (*Id.*). According to Dennis Kerby, Norfolk Southern's Assistant Vice President of Labor Relations, the level of appropriate disciplinary action for inappropriate language depends on the circumstances.[12] (Doc. # 28-24 at 12-13). The Norfolk Southern disciplinary system is intentionally flexible to address "things that can be corrected" while also addressing "situations where maybe someone has shown that they are incorrigible or can't correct their activity." (*Id.* at 16). Kerby testified that use of the words "asshole" and "motherfucker" could subject an employee to a range of discipline from counseling to a formal disciplinary hearing, depending primarily on the particulars of the employee's conduct and secondarily on the employee's service record, history, and intent. (*Id.* at 15-16). He explained that an employee could be terminated for using those expletives to refer to another specific individual if (1) the employee "didn't have the best record" and (2) the

---

Collier, Freeman, or Miles made any negative comment about the bad-order tags issued by the third shift on September 18.

[12] Defendant utilizes a progressive discipline system. Low-level punishments are handled with the START program, which differentiates between "START minor" infractions and "START serious" infractions. More serious disciplinary infractions are handled through a formal disciplinary hearing initiated with a charge letter. (Doc. # 32-3 at 5).

employee could not correct his or her behavior. (*Id.* at 16). Kerby understands a threat is "some kind of verbal statement or action that the other individual would perceive as intended to cause some kind of harm or injury or put him at some type of risk." (*Id.* at 18).

**E. The Investigation, Plaintiff's Dismissal, and Post-Dismissal Proceedings**

On September 20, 2013, McLain asked permission of Swany by email to remove Plaintiff from service because of "conduct unbecoming [of] an employee." (Doc. # 32-4 at 63-64). McLain asked Kevin Krull, a Norfolk Southern division manager in Knoxville, Tennessee, to conduct the removal hearing. (*Id.* at 63). In his email to Krull, McLain labeled Plaintiff as "easily the worst guy we have when it comes to attitudes [sic]." (*Id.*). Despite McLain's request, he never disciplined Plaintiff between June 2013 and September 2013.[13] (Doc. # 28-25 at 3). Nor was McLain aware of any safety complaints made by Plaintiff until September 19, 2013. (*Id.*).

At approximately 5:00 p.m. on September 20, Collier called Plaintiff and told him that Norfolk Southern was taking him out of service pending a formal investigation. (Doc. # 28-1 at 191-92). Collier told Plaintiff that he did not know the reason for the investigation. (*Id.* at 192). No one at Norfolk Southern questioned Plaintiff about his comments to Green or Dodson before he was removed from service. (*Id.* at 192, 216).

On September 23, 2013, McLain charged Plaintiff with conduct unbecoming of an employee for: (1) engaging in offensive and/or inappropriate behavior, in violation of Norfolk Southern's General Regulation GCR-1; and (2) making a threatening statement. (Doc. # 28-7 at 1). McLain's charge did not specify which regulation Plaintiff violated by making a threatening

---

[13] McLain began working at the Norris Yard in June 2012, while Plaintiff was on a leave of absence. (Doc. # 28-26 at 3).

statement. (*Id.*). Norfolk Southern did not give Plaintiff the option of waiving a disciplinary investigation. (*Id.*).

In an email exchange occurring on September 24, 2013, McLain informed Krull that Plaintiff's union had indicated that they would produce two witnesses to rebut the charges against Plaintiff. (Doc. # 32-4 at 65). McLain stated his belief that Norfolk Southern could "get around" their testimony because he doubted that both witnesses were in the locomotive office "for the whole 30 minutes or so that [Plaintiff] was there." (*Id.*). In response, Krull asked whether a witness who had testified in an earlier investigation, Gulledge, would be testifying at Plaintiff's hearing. (*Id.*). McLain replied, "No, unfortunately. The charged employee thinks he's smarter than Gulledge." (*Id.*). The email exchange ended with Krull writing, "We shall see. I like a challenge." (*Id.*). During his deposition, Krull explained that the earlier investigation described in the email exchange had presented a challenge to Krull because Gulledge had provided detailed information for the employee's case. (Doc. # 32-4 at 86). Krull recalled asking whether Gulledge would be present because, as Krull put it, Gulledge was "an exemplary witness in my mind." (*Id.* at 85). Despite Gulledge's "exemplary" testimony, Krull did not find his testimony credible. (*Id.*).

Krull presided over the disciplinary hearing held on January 16, 2014. (Doc. # 28-5 at 1). Plaintiff has acknowledged that no one directly referenced or discussed the FRA complaint investigated by Ferrell Arms during the termination proceedings. (Doc. # 28-1 at 253). During the hearing, McLain introduced the September 19 daily report as an exhibit and read Plaintiff's report about the ATV to Krull. (Doc. # 28-5 at 13-17). McLain also recounted that he directed Collier "to counsel [Plaintiff] regarding the comments on his train yard sheet in that that document is not the appropriate vehicle for [Plaintiff] to voice his opinion and that [Plaintiff]

should have sent a separate email with his concerns." (*Id.* at 17). McLain explained that Plaintiff should not have included the complaints about the ATV in the daily report because such reports were "official Norfolk Southern documents." (*Id.* at 27). And, he asserted that the ATV presented no "additional hazard or danger" as compared to a truck. (*Id.* at 28). He admitted that he had used profanity while working for the railroad, but he denied directing profanity towards a particular individual. (*Id.*).

Freeman also testified that he heard profanity used at the work site by supervisors and carmen (*id.* at 75-76), but he similarly distinguished profanity from profanity "directed at somebody, or about somebody." (*Id.* at 76). Green affirmed that she had heard profanity used in the office. (Doc. # 28-6 at 40). According to Green, supervisors had used profanities when discussing situations, but she could not recall whether they had directed profanities toward individuals. (*Id.*). Plaintiff candidly confirmed that he used profanity during the conversation with Green. (*Id.* at 70). He affirmed that he said "something close" to the statement reported by Dodson. (*Id.* at 72-73).

Following the hearing, Krull recommended to Norfolk Southern's Labor Relations Department that Plaintiff be terminated and the Department approved that recommendation. (Doc. # 1 at ¶ 73).[14] On February 14, 2014, Krull informed Plaintiff of his termination in a letter drafted by Labor Relations. (*Id.*). (*See also* Doc. # 32-4 at 73) (confirming that Krull sent the letter to Plaintiff).

On February 19, 2014, Plaintiff filed a complaint with the regional director of the Occupational Safety and Health Administration ("OSHA"). (Doc. # 28-2). In his OSHA complaint, Plaintiff claimed that Norfolk Southern had discriminated against him in violation of

---

[14] To be clear, Defendant has admitted these allegations in the complaint. Krull's recommendation and the February 14, 2014 termination letter are not in the Rule 56 record.

§ 20109. (*Id.* at 1). The complaint discussed Plaintiff's history of "complaints about hazardous conditions and safety issues" and noted that Plaintiff had earlier refused to quit bad ordering cars, despite management's removal of bad order tags. (*Id.*). It stated that Plaintiff had reported "safety issues" concerning the "inadequate and unduly hazardous Kubota vehicle" in the September 18-19 daily report. (*Id.*). In response, the OSHA complaint asserted that management harassed Plaintiff during the September 20 meeting to intimidate him. (*Id.* at 1-2). When the harassment failed, the complaint alleged that Norris Yard management took him out of service and terminated him. (*Id.* at 2).

On August 5, 2014, following its investigation, OSHA issued a decision finding no reasonable cause to support the § 20109 complaint. (Doc. # 28-20). On August 14, 2014, Plaintiff objected to OSHA's findings and requested a hearing before an Administrative Law Judge ("ALJ"). (Doc. # 1 at ¶ 87). On October 27, 2015, Plaintiff notified the ALJ of his intent to file this lawsuit. (*Id.* at ¶ 88). On November 20, 2015, Plaintiff filed this suit.

**F.     Norfolk Southern's Discipline of Identified "Comparators"**

In their briefing, the parties have discussed three prior cases of profanity and threats in the Alabama Division of Norfolk Southern. (*See, e.g.*, Doc. # 28-26 at 9-10). In a 2009 altercation, carman E.B. Roy physically threatened a student carman. (*Id.* at 9). Roy stated that he would "knock [his] f--- white ass out" and "punch [him] in the f---ing mouth, bitch." (*Id.*). McLain, who was then a general foreman in New Orleans, charged Roy with a violation of General Regulation GCR-1. (*Id.* at 9-10). Following a disciplinary hearing, Norfolk Southern dismissed Roy. (*Id.* at 10). Cooper, who represented Roy as a local chairman for the union shop, has distinguished Roy's incident from Plaintiff's incident because Roy's incident was "much

more serious," it was "much more dangerous," and it presented "a racial component and racial slurs." (Doc. # 32-3 at 5-6).

In July 2013, carman A.D. Moore confronted General Foreman Collier and threatened him. (Doc. # 28-26 at 9). Collier told Moore that he would be removed from service for providing a false reason for missing work. (*Id.*). Moore threatened to "kill that mother---er" and had to be physically restrained by Cooper. (Docs. # 28-26 at 9; 32-3 at 6). During the course of that conflict, Moore broke the glass window in the car shop door. (Doc. # 32-3 at 6). According to Cooper, "[the] situation came very close to a very violent physical assault." (*Id.*). McLain removed Moore from service and charged him under General Regulation GCR-1. (Doc. # 28-26 at 9). Moore resigned from Norfolk Southern prior to a disciplinary hearing. (*Id.*).

In March 2015, two gang leaders, S.S. Smith and D.S. Brown, argued in front of the Birmingham car shop office over the combination to a supervisor's door lock. (Doc. # 32-3 at 4-5). The two men threatened each other with profane language. (*Id.* at 5). Ultimately, one gang leader told the other, "I'm going to kill you motherfucker." (*Id.*). When a foreman informed Cooper about the incident, the foreman expressed uncertainty about whether the gang leaders would receive dismissal charges. (*Id.*). But, after Swany reviewed the incident, Cooper learned that the gang leaders would not receive dismissal charges. (*Id.*). Both gang leaders were given a ten-day deferred suspension.

## II.    Defendant's Motion to Strike

Plaintiff relies on the affidavit of Kenneth Cooper, a union representative, to support his claims. Defendant argues that Cooper's affidavit, all of its exhibits, and any portions of Plaintiff's reply brief discussing the affidavit should be stricken from the Rule 56 record because the opinions expressed by Cooper are (1) irrelevant, (2) hearsay under Federal Rule of Evidence

801, (3) duplicative and conclusory under Federal Rule of Evidence 701(b), and (4) contradictory of Plaintiff's testimony. (Doc. # 34 at 2-3). For the following reasons, the court disagrees.

As an initial matter, Plaintiff argues that Defendant's Motion to Strike is procedurally improper because it is not directed towards a pleading. (Doc. # 36 at 2). This assertion reflects different approaches that federal courts take on the appropriate procedural vehicle to contest Rule 56 evidence. Some courts permit motions to strike that challenge evidence submitted into the Rule 56 record because the Federal Rules of Civil Procedure do not provide another means to contest the evidence's sufficiency. *See, e.g., Morris v. Precoat Metals,* 2013 WL 830868, at *2 (N.D. Ala. Mar. 4, 2013) (explaining that a motion to strike can be treated like a motion *in limine*). Other courts allow a party to challenge Rule 56 evidence through a motion to exclude. *See, e.g., UCB, Inc. v. Teva Pharm. USA, Inc.*, 2015 WL 11199058, at *9 (N.D. Ga. Mar. 18, 2015). Still other courts require a party to challenge the opposition's factual assertion, rather than its submitted evidence, on the ground that the factual assertion "cannot be presented in a form that would be admissible in evidence." *See, e.g., Norris v. GKN Westland Aerospace, Inc.*, 2013 WL 440755, at *1 (M.D. Ala. Feb. 5, 2013) (quoting Fed. R. Civ. P. 56(c)(2)). Given the divergent case law on this issue, the court finds it appropriate to consider the merits of Defendant's Motion to Strike. *Cf. Stuckey v. Ala. Bd. of Pardons & Paroles,* 2012 WL 3670644, at *1 n. 2 (M.D. Ala. Aug. 27, 2012) (considering the substance of a party's motions to strike even though "the form of the motions is not grounded in a federal procedural rule").

The standard of relevance for admissible testimony is well known. Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence," and that fact "is of consequence in determining the action." Fed. R. Evid. 401; *see also*

*McCaskill v. Ray*, 279 F. App'x. 913, 915 (11th Cir. 2008). Cooper's affidavit addresses the safety of the Kubota ATV, the use of blanket punishment at the Norris Yard, and Norfolk Southern's response to similar incidents of profane threats to commit violence within the Alabama Division of Norfolk Southern. (*See* Doc. # 32-3 at 2-6). Cooper's statements are relevant because they concern whether Plaintiff's report was submitted in good faith, whether Plaintiff reported a hazardous safety condition, and whether Defendant would have terminated Plaintiff in the absence of any protected conduct.

Further, Cooper's testimony about the East Yard's use of a truck and the use of blanket punishment satisfy Rule 701, which permits opinion testimony so long as the opinions are (a) rationally based on the witness' perception, (b) helpful to clearly understanding the witness' testimony or to determining a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Cooper's testimony is neither scientific nor technical, and his comments are based on his first-hand knowledge of the operations at the Norris Yard, gathered through his 37 years as a carman and his work as a local chairman for the Brotherhood of Railway Carmen. (*See* Doc. # 32-3 at 2) (describing Cooper's experience). Cooper also had first-hand knowledge of the September 20 meeting between Plaintiff and Norris Yard managers, and his views about the reasons for the "heated" meeting are helpful to determining whether Norfolk Southern would have terminated Plaintiff in the absence of the alleged protected statement in the daily report. Thus, Cooper's opinions on these matters are relevant and admissible.

Defendant argues that Cooper's testimony and opinions concerning a consultant's study of blanket punishment are inadmissible because Cooper relies on hearsay evidence to present an irrelevant issue. The court is not convinced. Contrary to Defendant's argument, blanket

punishment is a relevant issue in this action because Plaintiff has argued in his opposition brief --
and alleged in his complaint -- that his complaint about blanket punishment presented a safety
issue. (*See* Doc. # 36 at 21) ("Moreover, the train yard report raises a valid concern regarding
blanket or collective punishment, which is also a safety issue, as it creates bad morale."). And,
Cooper has testified that he personally participated in the investigation. Accordingly, Cooper's
testimony about the investigation into blanket punishment at Norris Yard is relevant to this case.
Likewise, Cooper's lay opinion testimony that blanket punishment harmed employees' morale
and created a "less safe work environment" is admissible opinion testimony based on Cooper's
personal experience as a carman and local union representative. (*See* Doc. # 32-3 at 2-3). These
opinions are relevant to whether Plaintiff made a good faith safety complaint when discussing
the alleged use of blanket punishment.[15]

Finally, Defendant seeks to strike Cooper's testimony about the March 2015 incident
between S.S. Smith and D.S. Brown. (Doc. # 34 at 8-9). Defendant claims that the evidence is
hearsay because Cooper lacks personal knowledge about the incident and relies on statements
made by other individuals. (*Id.* at 8). But, Cooper has testified that he discussed the matter with
Norris Yard management as a union representative.[16] (Doc. # 32-3 at 5). And, the statements
made by Eric Thomas are non-hearsay statements by a Norfolk Southern's employee within the
scope of his employment relationship with Norfolk Southern. *See* Fed. R. Evid. 801(d)(2)(D).
The discipline reports submitted by Plaintiff show that Thomas was the officer who signed off on

---

[15]  In contrast, the printout and magazine article attached to Cooper's affidavit (Doc. # 32-3 at 16-22) do
not specifically discuss the use of collective punishment at Norfolk Southern. And, these exhibits would be hearsay
evidence if considered for the truth of the matters stated therein. At least arguably, these documents may be related
to the question of whether Plaintiff had a good faith basis for complaining about blanket punishment without raising
hearsay concerns. But, the court finds that the documents are not relevant to that issue because they do not discuss
collective punishment. In any event, although the court denies Defendant's motion to strike these documents, it
notes that they do not present material evidence in support of either party's argument.

[16]  Indeed, Cooper was the designated union representative for Smith and Brown. (Docs. # 32-3 at 24, 26).

Smith's and Brown's discipline. (*See* Doc. # 32-3 at 24, 26). For these reasons, the court finds that Cooper's testimony about Smith's and Brown's incident is not due to be excluded from the Rule 56 record on hearsay grounds.

Defendant also argues that the evidence about Smith's and Brown's altercation is irrelevant to this case because they are not appropriate comparators. Defendant insists that Smith and Brown are not comparators because they were charged with use of profanity, whereas Plaintiff was charged with making a threat. (Doc. # 34 at 8). In the context of employment discipline, the Eleventh Circuit requires a plaintiff to show that her proposed "comparator" is "similarly situated to the plaintiff in all relevant respects" and that the "quantity and quality of the comparator's misconduct must be nearly identical." *Stone & Webster Const., Inc. v. U.S. Dep't. of Labor,* 684 F.3d 1127, 1135 (11th Cir. 2012) (citations omitted). The court must determine "whether the comparator [was] involved in the same or similar conduct as the plaintiff yet disciplined in a different way." *Id.*

The court finds Cooper's testimony and the documentary evidence regarding Smith's and Brown's discipline to be admissible comparator evidence. The key question is not what Defendant charged Smith and Brown (on the one hand) and Plaintiff (on the other hand) with. The question is whether their respective conduct was nearly identical.[17] A reasonable jury, accepting Cooper's testimony as credible, could find that Smith and Brown used expletives in a personal confrontation and threatened each other with profane language.[18] Moreover, the disciplinary records indicate that Plaintiff, Smith, and Brown did not have a history of infractions

---

[17] Labels are not controlling. Rather, the court compares conduct. If an employer could influence the analysis of whether an employee was a comparator of another worker by virtue of what disciplinary label the employer placed on misconduct, that could skew the proper comparator analysis required by the Eleventh Circuit.

[18] Cooper testified that Smith and Brown were "threatening to badly hurt or kill each other. One of them said 'I'm going to kill you mother-fucker.'" (Doc. # 32-3 at 5).

19

within the 12 months prior to the respective incidents. (*See* Docs. # 28-11 at 2; 32-3 at 24, 26). A reasonable fact finder could find that the disparity between Plaintiff's charges and those issued to Smith and Brown for profane threats actually strengthens his retaliation claim because, according to Cooper, "there is no question that the Brown-Smith situation was much more serious, confrontational and dangerous, in every way, than [Plaintiff's] situation." (Doc. # 32-3 at 5). Thus, Plaintiff's proffered evidence about the Smith-Brown incident and the resulting discipline is relevant comparator evidence.

In conclusion, for the reasons explained above, Defendant's Motion to Strike (Doc. # 34) will be denied.

## III.    Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts

about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but … must set forth specific fats showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer,* 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV. Analysis

Defendant presents five arguments in support of its motion for summary judgment directed at Plaintiff's FRSA claim: (1) Plaintiff's safety complaints were neither sufficiently described nor reported in good faith because Plaintiff did not complain about the Kubota ATV until the West Yard's truck had been assigned to the East Yard; (2) Plaintiff failed to properly exhaust his administrative remedies; (3) no connection exists between Plaintiff's bad-ordering of railcars and his dismissal for using improper language and threatening a supervisor; (4) insufficient evidence has been presented to show that his alleged protected activity was a "contributing factor" in the adverse employment action; and (5) clear and convincing evidence proves that Defendant would have terminated Plaintiff regardless of his safety complaints. (*See generally* Doc. # 27). The court addresses these arguments below.

### A. Legal Standards Applicable to Plaintiff's FRSA Retaliation Claim

The FRSA's anti-retaliation provision incorporates the burdens of proof set out in the Wendell H. Ford Aviation and Investment Reform Act for the 21st Century ("AIR-21") anti-retaliation provision. 49 U.S.C. § 20109(d)(2)(A)(i) (incorporating burdens of proof from 42 U.S.C. § 42121(b)). The aviation act's anti-retaliation provision provides that an employee only needs to prove that the protected conduct "was a contributing factor in the unfavorable personnel

action alleged in the complaint." 42 U.S.C. § 42121(b)(2)(B)(i). The Eleventh Circuit has concluded that the aviation act's anti-retaliation provision "is more protective of plaintiff-employees than many similar measures" because a plaintiff can prevail by merely showing that the protected conduct "tend[ed] to affect in any way the outcome of the decision." *Majali v. U.S. Dep't of Labor*, 294 F. App'x 562, 566 (11th Cir. 2008) (quotation omitted).

The Third Circuit has similarly explained that Congress explicitly instructed courts to apply the AIR-21 burden-shifting framework to retaliation claims under § 20109. *See Araujo v. New Jersey Transit Rail Operations*, 708 F.3d 152, 157-58 (3rd Cir. 2013) (stating that "when a burden-shifting framework other than *McDonnell Douglas* is present in a statute, Congress specifically intended to alter any presumption that *McDonnell Douglas* is applicable"). The Third Circuit determined that the plain meaning of the statute created a framework that is far more protective of plaintiff-employees than *McDonnell Douglas*. *Id.* at 158. Thus, in the Third Circuit, a plaintiff-employee must only show that their protected activity under the FRSA was a "contributing factor" to the adverse employment action, not the predominant or sole cause of the retaliation. *See* 49 U.S.C. § 42121(b)(2)(B)(ii).

This court finds persuasive the analysis of another judge on this court, who applied the *Araujo* standard in an FRSA retaliation action. *See Morgan v. Norfolk So. Ry. Co.*, 2014 WL 3891984, at *1, *6 (N.D. Ala. Aug. 8, 2014) (Acker, J.). In *Morgan*, the plaintiff brought suit against Norfolk Southern under the FRSA. *Id.* at *1. The defendant instructed engine foremen, including the plaintiff, to make up and report safety violations in order to give the appearance that the defendant was improving its safety standards. *Id.* When the plaintiff refused to do so, he was "transferred" to a lower-ranked, lower-paid position in a new state. *Id.* The parties debated the nature of the protected activity and whether sufficient evidence existed to satisfy the

contributing factor standard. *Id.* at *2. Similar to this case, the alleged protected activity included emails and an inflammatory conversation between the plaintiff and his supervisor. *Id.* at *2-4. And, as in this case, the defendant argued that it would have taken the same adverse action regardless of the protected activity. *Id.* at *6.

In *Morgan*, the court found that the emails and conversation were sufficient for a jury to decide the protected activity question. *Id.* at *3. The court also found, using *Araujo*, that the FRSA has a less demanding causation standard than other employment retaliation statutes. *Id.* at *5. The court found that the plaintiff presented enough circumstantial evidence for a jury to find that retaliation was a contributing factor. *Id.* Once the plaintiff had satisfied his initial burden, the court declined to grant the defendant summary judgment on the basis that it would demoted the plaintiff regardless because it concluded that the "same decision" issue was one for a jury to decide. *Id.* at *6.

Implementing the *Araujo* framework here,[19] Plaintiff must show by a preponderance of the evidence that: (1) he engaged in protected activity; (2) the employer knew that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the adverse action. *Araujo*, 708 F.3d at 157; 29 C.F.R. § 1982.104(e)(2). Under the FRSA, a contributing factor is one which, "alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Morgan*, 2014 WL 3891984, at *5 (quoting *Ameristar Airways, Inc. v. Admin. Review Bd., U.S. Dep't. of Labor*, 650 F.3d 562, 567 (5th Cir. 2011)). "Once the plaintiff makes a showing that the protected activity was a 'contributing factor' to the adverse employment action, the burden shifts to the employer

---

[19] The Third Circuit's approach has also been adopted by the Fourth and Sixth Circuits. *See Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir. 2015) (quoting *Araujo*); *Consol. Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 337 (6th Cir. 2014) (citing *Araujo*). *But see Kuduk v. BNSF Ry. Co.*, 768 F.3d 786 (8th Cir. 2014) (finding that "the contributing factor that an employee must prove is intentional retaliation"); *BNSF R. Co. v. U.S. Dep't. of Labor*, 816 F.3d 628 (10th Cir. 2016).

to demonstrate[,] 'by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Araujo*, 708 F.3d at 157 (quoting 42 U.S.C. § 42121(b)(2)(B)(ii)).

**B.    Plaintiff Exhausted His Administrative Remedies by Raising the Bad-Order Issue in His 2004 OSHA Complaint.**

Defendant argues that it is entitled to summary judgment for any retaliation claim based on Plaintiff's bad-order tags because Plaintiff did not raise that retaliation claim to OSHA in his February 2014 OSHA complaint or his interview with an OSHA investigator. (Doc. # 26 at 22-25).  Plaintiff responds that he presented the bad-order tag issue in his February 2014 complaint because that complaint informed OSHA that he had refused to stop bad-ordering railcars.  (Doc. # 32 at 19-20).  On this issue, the court agrees with Plaintiff.

The FRSA requires an employee to exhaust his administrative remedies with OSHA before filing a complaint in federal court against his employer. *Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891, 899 (D. Minn. 2015) (citing 49 U.S.C. § 20109(d)). An employee exhausts his FRSA claim "if the civil claim grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." *Id.* (quoting *Fanning v. Potter*, 614 F.3d 845, 851-52 (8th Cir. 2010)). The court must construe Plaintiff's OSHA complaint liberally. *Id.* (quoting *Tart v. Hill Behan Lumber Co.*, 31 F.3d 668, 673 (8th Cir. 1994)). And, the court may consider an action "as broad as the scope of any investigation that reasonably could have been expected to result from the initial charge of discrimination." *Id.* (quoting *Fanning*, 614 F.3d at 852). In *Brisbois*, the district court considered whether the plaintiff had exhausted retaliation claims concerning the denial of "other reimbursements" and denied promotions. *Id.* at 899-900.  The district court found that the plaintiff had failed to exhaust the claims because her OSHA

complaint presented "discrete and highly specific incidents of alleged retaliation," which did not include a broad claim for denied reimbursements or a denied promotion. *See id.*

To the contrary, here, Plaintiff's claim that Norfolk Southern retaliated against him for refusing to stop bad-ordering railcars is within the scope of the retaliation claim presented in his OSHA complaint. Plaintiff's OSHA complaint asserted that he had raised "many" complaints about safety problems and hazardous conditions before 2013. (Doc. # 28-2 at 1). He explicitly mentioned that he previously had "refused to quit bad ordering cars, even though [Norfolk Southern] management had removed bad order tags from cars that he had tagged." (*Id.*). The OSHA complaint alleged that Norfolk Southern retaliated against him for engaging in "the protected activities noted above," which included Plaintiff's failure to stop bad ordering cars. (*Id.* at 2). Since Plaintiff's complaint alleged retaliation for a series of protected complaints about safety hazards, in addition to the incident that occurred in September 2013, OSHA's investigation reasonably could have considered the bad-order tag issues that occurred several years before September 2013. Plaintiff's OSHA complaint is distinguishable from the one at issue in *Brisbois* because his complaint presents both general and specific causes for Norfolk Southern's retaliatory discharge. *Cf. Brisbois*, 124 F. Supp. 3d at 899-900. That is, liberally construed, Plaintiff's OSHA complaint alleged that the ATV complaints, in conjunction with the earlier bad-order tag issues and Plaintiff's history of protected safety complaints, led Norfolk Southern to violate the FRSA and terminate him. (*See* Doc. # 28-2 at 1-2). Accordingly, Defendant is not entitled to summary judgment for Plaintiff's FRSA claim on the ground of administrative non-exhaustion.[20]

---

[20] Because the court finds that the OSHA complaint sufficiently raised the retaliation claim concerning bad-order tag issues, the court need not address the admissibility of the OSHA investigator's report because the report is not material evidence.

### C.     Plaintiff Has Established a *Prima Facie* Case of Retaliation

Defendant does not dispute that Plaintiff suffered an adverse employment action when Defendant terminated his employment on February 14, 2014. (*See generally* Doc. # 27). Defendant argues, though, that Plaintiff cannot establish the first, second, and fourth prongs of his prima facie case. (*Id.* at 20-30). That is, Defendant contends Plaintiff cannot establish a prima facie case because (1) Plaintiff did not engage in statutorily protected activity, (2) the decisionmakers who terminated Plaintiff were unaware of any FRSA protected activity, and (3) Plaintiff's termination was not causally connected to any protected activity. The court disagrees and addresses these arguments, in turn.

### 1.     Plaintiff Engaged in Protected Activity

The FRSA prohibits a railroad from discharging or discriminating against an employee for "reporting, in good faith, a hazardous safety or security condition."[21] 49 U.S.C. § 20109(b)(1)(A). This anti-retaliation provision, along with the rest of the FRSA, is intended "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Id.* § 20101. This anti-retaliation provision must be read in conjunction with the FRSA's prohibition on retaliation for providing information to certain agencies, officials, and supervisors about "conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security." *Id.* § 20109(a)(1). As § 20109(a) specifies situations where railroads and related employers cannot retaliate for an employee's report regarding a violation of a federal rule or regulation, § 20109(b)(1)(A) cannot be interpreted to require an employee to report a hazardous safety condition that violates a

---

[21] Plaintiff relies on this provision to establish that he committed protected conduct. (*See* Doc. # 32 at 22-24). Notably, Plaintiff does not rely on the FRSA's prohibitions against retaliation for providing information to a regulatory agency about a violation of a federal law, rule, or regulation. *See* 49 U.S.C. § 20109(a)(1). Nor does he claim that Norfolk Southern retaliated against him for refusing to violate or assist in violating a federal law, rule, or regulation. *See id.* § 20109(a)(2).

federal law, rule, or regulation in order to be protected from retaliation. To prove that a report was made in good faith, the plaintiff must genuinely believe that he was reporting a hazardous safety condition, and his belief must be objectively reasonable. *See Koziara v. BNSF Ry. Co.*, 2015 WL 137272, at *6 (W.D. Wisc. Jan. 9, 2015) (discussing good-faith reports of work-related injuries), *rev'd on other grounds*, 840 F.3d 873 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1449 (2017).

The Third Circuit has concluded that § 20109(b)(1)(A) does not apply to complaints about any and all hazardous safety conditions. *See Port Auth. Trans-Hudson Corp. v. Sec'y, U.S. Dep't of Labor*, 776 F.3d 157, 165-66 (3d Cir. 2015) (explaining that § 20109(b)(1)(A) would not protect an employee who protested hazardous conditions at a power plant unrelated to a railroad). According to the Third Circuit, a plaintiff must complain about a "work-related" hazardous safety condition in order to fall under the protections of the statute, even though the statute contains no express requirement for an employee to report a work-related hazardous condition. *Id.* at 166. Beyond the Third Circuit's discussion of the provision in *Trans-Hudson Corp.*, there has been very little judicial or administrative interpretation of § 20109(b)(1)(A). The Code of Federal Regulations reiterates the FRSA's anti-retaliation provision, *see* 29 C.F.R. § 1982.102(b)(2)(i)(A), but no regulation has defined what constitutes a hazardous safety condition. Nevertheless, a few judicial and administrative opinions provide guidance on what may be considered a report of a hazardous safety condition.

In *Foster v. BNSF Railway Co.*, 2017 WL 3426374, at *1 (8th Cir. Aug. 10, 2017), the plaintiffs reportedly were directed to walk over a bridge with no walkway, side rails, or lighting while conducting a crew change. After a co-employee fell from the bridge, the employees reported the directions and the unsafe walking conditions in a written statement to a trainmaster.

*Id.* One employee also provided a recorded statement to a claims representative. *Id.* BNSF Railway then charged the plaintiffs with rule infractions and disciplined them. *Id.* at *1-2. An arbitration panel ultimately overturned the discipline imposed against the plaintiffs, but they sued under the FRSA. *Id.* at *2. The Eighth Circuit held that the plaintiffs' written statements were not reports of a violation of federal law protected under § 20109(a)(1). *Id.* at *4-5. But, it found that the statements were good faith reports of a hazardous safety condition that would have been protected under § 20109(b)(1)(A) if the plaintiffs had brought a claim under that provision. *Id.* at *4.

In *Leiva v. Union Pacific Railroad Co.*, 2015 WL 3539576, at *1-2 (DOL Admin. Rev. Bd. May 29, 2015), an employee complained to Union Pacific that he could not work with a conductor who had threatened him and used profanity towards him. Union Pacific removed the employee from service because he declined to continue traveling with the conductor. *Id.* at *2. The employee testified that the complaint concerned a safety hazard because "the level of communication between an engineer and conductor is very important and essential to the safe operation of a train." *Id.* at *3. The Administrative Review Board affirmed an ALJ's finding that the complaint qualified as a report of a hazardous safety or security condition protected by § 20109(b)(1)(A). *Id.* at *4. It determined that substantial evidence supported the ALJ's finding because: (1) several witnesses stated that the employee felt threatened; (2) the employee testified "that communication between an engineer and a conductor is essential to the safe operation of a train"; (3) the conflict increased the likelihood of a safety hazard; (4) another witness found the conductor's conduct to create a safety issue; and (5) a supervisor did not question the employee's good faith in reporting the incident. *Id.*

In *Jackson v. Union Pacific Railroad Co.*, 2015 WL 1519814, at *1 (DOL Admin. Rev. Bd. Mar. 20, 2015), an employee reported a smoky smell and asked his supervisor to determine whether "any health advisories had been issued." The employee asked to be reassigned to a different area with no smoke. *Id.* Instead, Union Pacific sent the employee away from the worksite and directed him to obtain medical clearance to return to work. *Id.* The Administrative Review Board affirmed an ALJ's finding that the verbal complaint about smoke was protected conduct under § 20109(b)(1)(A). *Id.* at *2. It observed that other employees had complained about the conditions. *Id.* Moreover, a Union Pacific supervisor testified that he expected employees to report "safety concern[s] about smoky conditions." *Id.*

Here, a reasonable jury could find that Plaintiff's complaints about the Kubota ATV were good-faith reports of a hazardous safety condition.[22] The Rule 56 record reveals that Plaintiff tried to give a verbal complaint about the Kubota ATV to Freeman on September 19, 2013, but Freeman did not allow him to discuss the issue because of a derailment. (Doc. # 28-1 at 208-10). Then, Plaintiff wrote in the daily report on September 19 that the Kubota ATV exposed carmen to hazards and dangers because of the long distances carmen had to drive in the West Yard and the ATV's lack of speed. (*See* Doc. # 28-3). That evening, Plaintiff called Miles and complained about the lack of visibility in the ATV. (Docs. # 28-1 at 166-70; 28-28 at 24-25, 30-31). As in *Leiva*, Plaintiff's written complaint about the ATV identified a specific safety concern -- the ATV's lack of speed -- and explained how that concern created a hazard for carmen. (*See* Doc. # 28-3). *See also Leiva*, 2015 WL 3539576, at *4 (finding substantial evidence to support an employee's assertion that a report about an argument affecting communication was a report of a hazardous safety condition). Moreover, as in *Leiva*, one of Plaintiff's supervisors, Miles,

---

[22] Defendant has not argued that Plaintiff's reports about the bad-order tags fail to qualify as reports about hazardous safety conditions. Without question, that conduct concerns hazardous safety conditions (*i.e.*, the removal of bad-order tags placed on railcars so that they would be repaired).

perceived his complaint to be one regarding a safety issue. (Doc. # 28-28 at 31). In light of the relatively minor safety hazards at issue in *Leiva* and *Jackson* and Miles's testimony that he viewed Plaintiff's complaint to be one about a safety issue, the court cannot find that -- as a matter of law -- Plaintiff's written and verbal complaints fail to present a report of a hazardous safety condition.[23]

Defendant contends that "no reasonable jury could conclude that [Plaintiff] reasonably believed that he was reporting in good faith a hazardous safety condition when he had been personally running the Kubota at least 4 days with no safety complaint whatsoever." (Doc. # 27 at 19). The court disagrees. As an initial matter, an employee could reasonably accept the risk of a short-term safety issue for a few days and later complain when he learns that the safety issue will not be remedied as expected. Such a delay does not preclude an employee from presenting an objectively reasonable safety complaint. Moreover, Plaintiff has testified that he complained about the ATV before September 18. (Doc. # 28-1 at 96-97). While Plaintiff may not have complained about the ATV's *safety* during that period, Defendant's argument that he made "no complaints about the Kubota until <u>after</u> the truck came back from repairs" is not supported by the Rule 56 record. (Doc. # 27 at 20). Accordingly, Plaintiff has established the first prong of his prima facie retaliation claim.

## 2. Defendant's Decisionmakers Knew About the Kubota ATV Complaints

To show that Defendant knew of this protected activity, "it is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff

---

[23] Of course, a reasonable fact finder could determine that Plaintiff's complaints were motivated by the less comfortable ride the Kubota offered. (*See* Doc. # 28-1 at 89) (testifying that the ATV "couldn't gently accommodate the potholes and the ruts and the washouts" in the West Yard). But, the point is that Plaintiff's complaints in September 2013 presented possible safety hazards the ATV presented, such as its lack of speed and inadequate windshield. It is for a jury to resolve these disputed facts and inferences.

must show that the person taking the adverse action was aware of the protected expression." *Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001). *See also Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 107-08 (4th Cir. 2016) (citing Administrative Review Board opinions in support of the holding that "[t]he 'knowledge' relevant for a retaliation claim under the FRSA must be tied to the decision-maker involved in the unfavorable personnel action").

Defendant has not argued that its decision-makers were unaware of Plaintiff's September 2013 complaints about the Kubota ATV. (*See* Doc. # 27 at 20-22). Indeed, McLain testified about the September 19 daily report during Plaintiff's disciplinary hearing, and Krull heard that testimony. (*See* Doc. # 28-5 at 13-17). McLain stated during the hearing that Plaintiff inappropriately complained about the ATV in an official document. (*Id.* at 27). Thus, the Rule 56 record shows that the charging officer and the hearing officer knew of the Kubota ATV complaints.

In addition to the September 2013 ATV complaints, Plaintiff also asserts his termination was in retaliation for his 2004 complaint about bad-ordering cars. (Doc. # 32 at 20-21). Defendant contends Plaintiff cannot establish that any decisionmaker involved in his termination knew or was involved in the 2004 controversy. (Doc. # 27 at 25). Plaintiff claims that Collier, one of the supervisors involved in the investigation into his comments, was the supervisor at issue in the bad-order tag complaint. (Doc. # 32 at 20-21). The court does not find sufficient evidence to show that the decisionmakers knew of the bad-order tag complaints, which occurred several years before 2013. Although Collier was involved in both incidents, no evidence supports the supposition that Collier informed McLain about Plaintiff's prior safety complaints. Moreover, no witness discussed Plaintiff's bad-order tag complaints during the disciplinary

hearing. So, no Rule 56 evidence indicates that Krull knew of the bad-order tag complaints. Accordingly, Plaintiff has not shown that the relevant decisionmakers at Norfolk Southern knew of the bad-order tag complaints when considering his termination, and Plaintiff cannot maintain any FRSA retaliation claim against Norfolk Southern premised on those safety complaints.[24]

### 3. Plaintiff's Protected Activity was a Contributing Factor in His Termination

To satisfy the final element of a prima facie FRSA retaliation claim, a plaintiff must demonstrate "that retaliation was a 'contributing factor' to the adverse employment decision, 'which alone or in combination with other factors, tend[ed] to affect in any way the outcome of the decision." *Morgan,* 2014 WL 3891984, at *5 (quoting *Araujo*, 708 F.3d at 158). Circumstantial evidence, including temporal proximity and hostility towards a complainant's protected activity, can satisfy the contributing factor standard. *See Ray v. Union Pac. R.R. Co.*, 971 F. Supp. 2d 869, 884-885 (S.D. Iowa 2013).

In the instant case, Plaintiff was removed from service one day after he submitted his daily report to management with safety complaints regarding his immediate superiors and one day after he complained to Miles about the ATV's windshield. (Doc. # 28-1 at 191-92). Thus, from a temporal standpoint, his removal from service was immediately after his written and verbal complaints about the ATV's safety. Moreover, Plaintiff's supervisors counseled him against placing such safety complaints in daily reports on the day that he was removed from service. (*See* Doc. # 28-26 at 8). McLain has explained that complaints like Plaintiff's should not be placed in daily reports because those reports are "widely circulated." (*Id.*). Thus, a jury could reasonably conclude that McLain, the charging officer, expressed hostility towards Plaintiff's

---

[24] Alternatively, Plaintiff cannot show that his bad-order tag complains were a contributing factor in his termination. Those complaints occurred several years before the termination at issue. And, the bad-order tag complaints were not discussed in the charge against Plaintiff or at the disciplinary hearing. Thus, no reasonable jury could conclude that the bad-order tag complaints played any role in Plaintiff's termination.

protected conduct by having supervisors counsel him and by charging him with a terminable offense for conduct that would not have resulted in a termination otherwise.

Likewise, a reasonable jury could conclude that hostility towards Plaintiff's protected reports of hazardous safety conditions contributed to Krull's recommendation. McLain arranged for Krull to serve as the hearing officer for the disciplinary investigation. (Doc. # 32-4 at 63). In his email to Krull, McLain described Plaintiff as "easily the worst guy we have when it comes to attitudes." (*Id.*). Then, at the disciplinary hearing, McLain read Plaintiff's complaint about the Kubota ATV into the record and criticized Plaintiff for including such a complaint in an official Norfolk Southern document. (Doc. # 28-5 at 13-17, 27). As Defendant has not placed Krull's recommendation to human resources personnel in the record, the court cannot determine whether Krull relied on the Kubota ATV report as a basis for recommending Plaintiff's termination. Nevertheless, since McLain criticized Plaintiff's "attitude" to Krull and informed Krull about the safety complaints, a reasonable jury could find that the protected safety complaints about the ATV contributed to Krull's recommendation to terminate Plaintiff. Accordingly, Plaintiff has established a prima facie case of retaliatory termination in violation of the FRSA.

## D. Defendant's Affirmative Defense is an Issue that Must be Decided at Trial

Defendant contends that it is entitled to summary judgment because "clear and convincing evidence [demonstrates] that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Araujo,* 708 F.3d at 159 (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)). Defendant contends that Plaintiff's conduct was so serious that it warranted termination -- regardless of the protected activity -- because threats and improper language are not tolerated by Defendant. (Doc. # 28-26 at 8, 10). Defendant points to the discipline imposed against carmen Moore and Roy for making profanity-laced threats of

violence. (*See id.* at 9-10). Like Plaintiff, Norfolk Southern charged Moore and Roy with violating GCR-1. (*See id.*). And, like Plaintiff, Norfolk Southern terminated Roy for his threats. (*Id.*). Despite the evidence surrounding these two compelling comparators, it is not entitled to summary judgment on this affirmative defense.

Plaintiff, like Defendant, has also put forth evidence of comparators who engaged in similar conduct to him. D.S. Brown and S.S. Smith cursed at each other and threatened each other in a face-to-face confrontation in March 2015. (Doc. # 32-3 at 4-5). Yet, Brown and Smith received suspensions and were not issued formal charges that could have led to termination. (*Id.* at 5). Defendant insists that Brown and Moore are improper comparators because Norfolk Southern charged them with using profanity and did not charge them with issuing threats. (Doc. # 35 at 15). But, Norfolk Southern management controlled the nature of the charges issued to an employee for a work violation. McLain's email to Krull indicates that he issued more severe charges against Plaintiff because Plaintiff had "one of the worst attitudes" among employees at Norris Yard. In light of McLain's hostile response to the ATV complaint in the September 19, 2013 daily report, this statement can reasonably be read as an indication that McLain instituted more serious charges because of Plaintiff's attitude towards the purported safety hazards created by the Kubota ATV. Likewise, Defendant's argument that Plaintiff was disciplined by a different decisionmaker is unconvincing because management's charging decision led to Krull's involvement in the case. Because McLain instituted formal charges against Plaintiff, rather than START charges, a hearing officer from a different Norfolk Southern division was brought in.

In its reply brief, Defendant argues that Plaintiff has failed to present comparators with "nearly identical" records. (Doc. # 35 at 14). The court observes, though, that Defendant has not presented the disciplinary records for its proposed comparators. Accordingly, the court cannot

determine whether Moore and Roy had nearly identical records to Plaintiff's when Norfolk Southern instituted formal charges against them. And, unlike the situation an employer faces when confronted with a retaliation claim under Title VII and similar anti-discrimination statutes, Defendant faces a burden of proof, not a burden of production, to rebut Plaintiff's prima facie case. *See Araujo,* 708 F.3d at 159. Although the Rule 56 record does not show that Brown and Smith were "nearly identical" comparators, Norfolk Southern's handling of their profanity-laced threats raises a genuine factual dispute about whether Plaintiff would have been terminated for his profane statements and one-line threat to Freeman in the absence of his statutorily-protected safety complaints.

### E. Plaintiff is Not Entitled to Seek Punitive Damages

Defendant requests summary judgment on Plaintiff's claim for punitive damages. (Doc. # 27 at 31). Plaintiff has not responded to this issue. (*See generally* Doc. # 32). Thus, Plaintiff has abandoned any claim for punitive damages. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325-26 (11th Cir. 2000) (holding that a state law claim was effectively abandoned when a party failed to brief and argue the issue before the district court).

In any event, the court finds that Plaintiff is not entitled to seek punitive damages at trial. The court may award punitive damages under the FRSA if a railroad acted "with malice or ill will or with knowledge that its actions violated federal law or with reckless disregard or callous indifference to the risk that its actions violated federal law." *Pan Am Rys., Inc. v. U.S. Dep't of Labor*, 855 F.3d 29, 38 (1st Cir. 2017) (emphases omitted). The Rule 56 record presents no evidence of a reckless or intentional violation of the FRSA. The parties clearly disagree about whether Plaintiff observed a safety hazard created by continued use of the Kubota ATV in the

West Yard. Moreover, McLain charged Plaintiff with rules violations for incidents in which he did not present a protected safety complaint. Accordingly, the court finds that Defendant is entitled to summary judgment on the punitive damages issue.

## V.     Conclusion

For the reasons explained above, Defendant's motion to strike is due to be denied. Defendant's motion for summary judgment is due to be granted in part and denied in part. While Defendant is entitled to summary judgment for Plaintiff's punitive damages claim, it is not entitled to summary judgment on Plaintiff's FRSA retaliation claim. A separate order in accordance with this memorandum opinion will be entered.

**DONE** and **ORDERED** this September 12, 2017.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE